NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

ACE AMERICAN INSURANCE              )
COMPANY, ILLINOIS UNION             )
INSURANCE COMPANY,                  )
WESTCHESTER SURPLUS LINES           )
INSURANCE COMPANY, and              )
WESTCHESTER FIRE INSURANCE          )
COMPANY,                            )
                                    )        Civil Action No.: 08-4369 (JLL)
                 Plaintiffs,        )
                                    )              **OPINION**
        v.                          )
                                    )
WACHOVIA INSURANCE AGENCY           )
INC. D/B/A/ E-RISK SERVICES and     )
SCOTTSDALE INSURANCE COMPANY,       )
                                    )
                 Defendants.        )
_____)

**LINARES, District Judge.**

This matter comes before the Court on the order to show cause of Plaintiffs ACE

American Insurance Company, Illinois Union Insurance Company, Westchester Surplus

Lines Insurance Company, and Westchester Fire Insurance Company (collectively

"Plaintiffs" or "ACE") requesting a preliminary injunction pursuant to Federal Rule of

Civil Procedure 65 against Defendants Wachovia Insurance Agency Inc. ("WIA") and

Scottsdale Insurance Company ("Scottsdale") (collectively "Defendants").  Also before

the Court at this time is WIA's cross-motion for injunctive relief against ACE.  For the

reasons set forth in this Opinion, Plaintiffs' request for preliminary injunctive relief is

denied in part and granted in part, and WIA's request for injunctive relief is denied.

Prior to analyzing the issues on the motions presently before the Court, it is necessary to briefly sketch the facts underlying the claims of the parties. On January 1, 2002, ACE entered into an exclusive insurance agency agreement with E-Risk Services to sell certain business insurance. (Compl. ¶ 15.) E-Risk Services was later acquired by Wachovia Corp. in October of 2002, becoming a direct subsidiary of Wachovia Corp. named Wachovia Insurance Agency, Inc., but continuing to do business as E-Risk Services. (Id. ¶ 16.) ACE and WIA eventually executed a new agreement, titled the "Amended and Restated Agency Agreement for E-Risk Program Between [ACE] and [WIA]," that became effective on January 1, 2006. (Id. Ex. 1.) Pursuant to the January 2006 agreement (hereinafter the "Agency Agreement"), WIA and ACE entered into an arrangement whereby ACE became the exclusive insurance carrier on certain business insurance sold by WIA.[1] (Id. ¶¶ 18-26.) This contract, by its own terms, was to continue in force at least until December 31, 2010. (Compl. Ex. 1 § II; Pl. Br. at 5.) Under the terms of the Agency Agreement, WIA had exclusive rights to its own renewal business, but both companies would compete in the market for new business. (Compl. Ex. 1; ACE Prop. Findings ¶¶ 50-51; WIA Prop. Findings ¶ 27; ACE Response to WIA Findings at 3-4.)

During 2007, ACE announced—with WIA in attendance—that it was consolidating some of its insurance programs under the banner of "Diversified Risk." (ACE Prop. Findings ¶¶ 147, 149; Tomasi Dec. ¶¶ 33-36.) Some of the insurance offered

---

[1]The types of policies covered by the Agency Agreement were: directors & officers, employment practices, errors & omissions, fiduciary, crime, insured persons, and technology, media, and professional services. (Compl. Ex. 1 at A-3.)

by ACE's Diversified Risk unit competed with the E-Risk insurance marketed by WIA. (ACE Prop. Findings ¶¶ 146-47, 149; Tomasi Dec. ¶¶ 33-36.)

Shortly thereafter, during the summer of 2007, ACE and WIA negotiated possible changes to the Agency Agreement. (WIA Reply Br. at 3.) One of ACE's proposals was an alteration in the coverage WIA could offer under the E-Risk program. (WIA Prop. Findings ¶¶ 15-16.) WIA maintains that its business would have decreased 45% under the proposed underwriting changes. (Id. ¶ 17; Tomasi Dec. ¶ 42.) WIA finally rejected the revisions to the Agency Agreement in May 2008. (WIA Opp. Br. at 19.)

Faced with a changing business environment for the Agency Agreement, WIA contacted Scottsdale late 2007 to investigate the possibility of changing carriers for the E-Risk program. (WIA Prop. Findings ¶ 57; ACE Response to WIA Findings ¶ 20.) In conducting negotiations with Scottsdale, WIA provided information concerning the E-Risk business in order for Scottsdale to make a business decision as to becoming the E-Risk carrier in lieu of ACE. (WIA Prop. Findings ¶ 58.) WIA provided Scottsdale with "information concerning paid claims and information concerning large losses," consisting of "loss runs" and "book rolls." (Pl. Reply Br. at 6; WIA Prop. Findings ¶¶ 59, 69-70.) WIA admits that the information provided, while available for its clients regarding each client's own piece of business, was not available in the aggregated form supplied to Scottsdale. (WIA Prop. Findings ¶ 71.)

Wachovia Corp. became interested in selling the E-Risk business early in 2008. (Compl. ¶ 38; WIA Prop. Findings ¶ 37.) Wachovia Corp. declined an offer by ACE to acquire the E-Risk business, and then considered and provisionally accepted an offer by WIA's management to purchase the assets of the E-Risk business. (Compl. ¶ 41, Ex. 10

3

at 1; WIA Prop. Findings ¶¶ 39-44.)  The transaction between WIA's management and Wachovia Corp. did not include an assignment of the Agency Agreement to the new entity.  (Compl. Ex. 10 at 1.)

As these other events occurred, WIA believed that ACE was attempting to acquire E-Risk renewal business in contravention of the Agency Agreement.  In October of 2007, WIA notified ACE of ACE's acquisition of WIA renewal business.  (Kransdorf Dec. ¶ 8, Ex. A.)  Additionally, WIA became aware of an attempt by ACE to solicit business from a WIA customer, Socius Insurance, occurring on March 24, 2008.  (Id. ¶ 47; Brune Reply Dec. ¶¶ 7-8; ACE Response to WIA Findings at 4.)

In August of 2008, ACE became aware of certain filings with state insurance agencies by Scottsdale, some as early as May 2008, utilizing substantially the same forms as ACE and using trademarks associated with the E-Risk Program.  (Compl. ¶¶ 43-45, 48-49.)  Plaintiffs allege that the Scottsdale E-Risk forms were based upon recent ACE forms and confidential information not in the public domain at the time of their use by Scottsdale.  (Id. ¶ 51.)  ACE alleges that WIA violated the Agency Agreement by providing confidential information and ACE property to Scottsdale in furtherance of an ongoing and future business arrangement between WIA management's new E-Risk entity and Scottsdale.  (Id. ¶¶ 56-57.)

WIA admits that it provided "copies of insurance policies" to Scottsdale, but denies providing any "nonpublic" policies.  (WIA Opp. Br. at 21.)  WIA asserts that once a policy becomes public, it is easily accessible through internet databases and state insurance agencies.  (Id. at 21-22.)  WIA also admits that it provided copies of

4

application forms to Scottsdale, but argues that application forms are also public and not the property of ACE under the Agency Agreement.  (Id. at 23.)

ACE filed this action by way of Order to Show Cause in this Court on September 2, 2008, requesting injunctive relief only against WIA pending arbitration, and requesting damages and injunctive relief against Scottsdale.  Specifically, ACE alleges that WIA breached the Agency Agreement, violated its fiduciary duty to Plaintiffs, and disclosed trade secrets to Scottsdale.  (Compl. ¶¶ 77-85.)  With respect to Scottsdale, Plaintiffs request injunctive and legal relief based upon theories of tortious interference with contract, misappropriation of trade secrets, and false advertising.  (Compl. ¶¶ 88-120.)

This Court granted ACE's request for temporary restraints as to WIA, but denied them as to Scottsdale, on September 4, 2008.  WIA then moved for injunctive relief regarding the competitive restrictions in the Agency Agreement on September 8, 2008.  Pending before the Court are ACE's motion for a preliminary injunction and WIA's motion for preliminary injunctive relief.  (While WIA's motion is styled as one for temporary restraints, the motion papers stated that WIA would move for relief at the time originally scheduled for oral argument on ACE's motion.  WIA's request for injunctive relief was not argued by the parties at that hearing, and will therefore be decided on the papers in this Opinion.)

## DISCUSSION

Injunctive relief is an "'extraordinary remedy' and 'should be granted only in limited circumstances.'"  Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)).  A court may grant an injunction only if a party shows: "(1) a

likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." Kos Pharms., 369 F.3d at 708.  A party must produce sufficient evidence of all four factors—and a district court should weigh all four—prior to granting injunctive relief. Winback, 42 F.3d at 1427.  However, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." Id. at 1427, n.8.

## A.    ACE's Request for Injunctive Relief Against WIA

ACE argues that it is entitled to injunctive relief against WIA based on breaches of the Agency Agreement and violations of fiduciary duty.  (Compl. ¶¶ 80-85.)  ACE claims that WIA breached the Agency Agreement by assisting Scottsdale in conducting the E-Risk business, disclosing confidential documents, confidential information, and trade secrets to Scottsdale, preventing ACE from accessing required information on policies, and arranging to transfer the E-Risk business and associated confidential data and trade secrets to a new entity.  (Id.)  ACE further alleges that these same acts also constitute a violation of fiduciary duty.  (Id.)

### 1.    Likelihood of Success in Breach of the Agency Agreement: Disclosure of Confidential Data and Trade Secrets

ACE argues that the presence of aggregated insurance information and undisclosed insurance form documents in the possession of WIA constitute either trade secrets or protected confidential information, and that ACE deserves injunctive relief to protect this information from disclosure under the Agency Agreement.  (Pl. Br. at 2-4.)

6

This Court granted ACE's request for a TRO against WIA based on the release by Scottsdale of a previously nonpublic form presumably obtained from WIA in contravention of the Agency Agreement.  (Op. of Sept. 4, 2008 at 7.)  WIA challenges the granting of a preliminary injunction on the same grounds by contending that none of the documents released to Scottsdale were previously not available to the public, and that therefore no breach of the Agency Agreement occurred justifying injunctive relief.

Specifically, WIA asserts that the allegedly nonpublic forms disclosed by Scottsdale were accessible through WIA's E-Risk website since March 2007.  (WIA Opp. Br at 28; Tomasi Dec ¶ 73.)  WIA also claims that the only information exchanged with Scottsdale other than publicly accessible policy and application information was premium, retention, and loss information in the form of "book rolls" that are also not confidential and do not constitute trade secrets.  (WIA Opp. Br. at 28-29.)  These book rolls are, according to WIA, routinely exchanged within the industry, were exchanged with Wachovia prior to Wachovia's purchase of E-Risk without a claim of breach under the 2001 agreement, and are circulated to WIA's clients.[2]  (Id.)  ACE does not dispute WIA's assertions in this context, but instead points to disclosures by WIA of "aggregated" financial and insurance data, including asset and revenue information across different product lines for the years 2003-2007, and a 705-page "loss run" for the E-Risk business.  (Pl. Reply Br. at 6.)  WIA admits that it did release an aggregated loss

---

[2]WIA also asserts that a document filed under seal demonstrates that ACE supplied standards of what information was to be placed in a book roll.  WIA does not, however, identify for the Court which portion of the document defines the materials permitted to be included in released book rolls, and this Court cannot comb the entire document, unaided, to support WIA's assertion.  United States v. Hoffecker, 530 F.3d 137, 162 (3d Cir. 2008).

run to Scottsdale, but it claims that the loss run had been purged of any ACE actuarial information.  (WIA Reply Br. at 6-7.)  ACE claims that the loss run data is never released publicly and constitutes a trade secret.  (Pl. Reply Br. at 6.)

The Agency Agreement bars WIA from disclosing confidential information to third parties and prohibits it from working with other insurers on E-Risk business. (Compl. Ex. 1 §§ IV.I.1-4, XXII.)  The Agency Agreement states that "any data processing software or data processing technology or applications, policies, endorsements or forms, or data processing technology which produces such applications, policies, endorsement, or forms, or any other supplies" supplied by either party is considered confidential information under the agreement if it is not publicly available. (Id. §§ IV.I.1, IV.I.3.)  Similarly, "loss and pricing data, underwriting criteria and surveys, loss control information, and other related Program data," despite being WIA's property, are also confidential information if not publicly available.  (Id. §§ IV.I.2, IV.I.3.)  The confidentiality provision does not depend on which party owns the information or technology in question.   (Id. § IV.I.3.)  With respect to other insurers, the Agency Agreement prevents WIA from entering into "an agency agreement for Program Business with an entity, other than [ACE], during the term of this Agreement," unless certain defined events took place.  (Id. § XXII.)

In regard to whether or not ACE is likely to succeed on its breach of contract theory concerning the disclosures to Scottsdale, this Court must determine whether or not the information transferred from WIA to Scottsdale was within the ambit of the Agency Agreement's confidentiality provisions.  WIA claims in its opposition brief that the disclosure this Court relied upon in granting the TRO, insurance applications that ACE

8

thought had not been put into use, consisted of publicly available information, and thus were not confidential information under the Agency Agreement. (WIA Opp. Br at 28; Tomasi Dec ¶ 73.) ACE continues to assert, however, that certain filings by Scottsdale contain undisclosed confidential information owned by ACE under the Agency Agreement. (Roman Reply Dec. ¶¶ 14, 19-21.) This Court finds, despite ACE's continued assertion, that substantial doubt exists as to whether these documents had not been disclosed on websites or used by brokers and insureds. Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26 (3d Cir. 1961) (holding that disputed material facts prevent issuance of injunctive relief); WIA Reply Br. at 18; Tr. of Sept. 19, 2008 at 102:14-19. The facts in the case have now developed to the point where injunctive relief would not be appropriate based solely upon the application and insurance form disclosure, because the likelihood of success on the original ground has been substantially lowered: the "reasonable probability that it will prevail on the merits" is now far less likely if those forms have been available on the internet since March 2007, as asserted by WIA. Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975); Gruntal & Co., Inc. v. Steinberg, 843 F. Supp. 1, 16 (D.N.J. 1994) (change in facts at bar resulting in end of injunctive relief). This Court, therefore, denies preliminary injunctive relief against WIA with regard to policy forms and application information.

    With respect to the transfer of the loss run and the 2003-2007 aggregated data to Scottsdale by WIA, however, such data lies within the scope of the confidentiality provisions in the Agency Agreement. This financial data is squarely within the "loss and pricing data, underwriting criteria and surveys, loss control information, and other related Program data" made confidential in the Agency Agreement. (Compl. Ex. 1 § IV.I.3.)

This Court does not agree with WIA's contention that "premium" data is not included in "pricing" data within the terms of the agreement: premium is defined as the "amount paid or payable, often in installments, for an insurance policy."  American Heritage Dictionary 978 (2nd. Coll. Ed. 1991); WIA Reply Br. at 6.  The amount paid for an insurance policy is clearly covered by the term "pricing" in Section IV.I.3. of the Agency Agreement, and the usage of the word "premium" in Section IV.E of the Agency Agreement comports with the dictionary definition supra.  Furthermore, WIA itself requested that Scottsdale not disclose at least a portion of this information to any additional parties, indicating that it was not publicly available.  (Pl. Reply Br. at 6.)  This WIA disclosure demonstrates a likelihood of success on the merits for ACE with respect to a breach of the Agency Agreement's confidentiality provisions, and would suffice to provide injunctive relief to ACE under the circumstances.  WIA cites cases for the proposition that if an issue of disputed material fact exists, an injunction should not issue.  Charles Simkin & Sons, Inc. v. Massiah, 289 F.2d 26 (3d Cir. 1961); Hunterdon Transformer Co. v. Cook, No. 89-3132, 1990 WL 10342, at *2 (D.N.J. Feb. 6, 1990); Riley v. Brown, No. 06-331, 2006 WL 1722622, at *7 (D.N.J. June 21, 2006).  Here, however, it is undisputed that WIA collected the financial information it provided to Scottsdale from numerous sources, and provided it in an "aggregated" form not publicly available.  (WIA Reply Br. at 19.) Although the Court has already agreed with WIA that substantial questions of material fact swirl around the issue of the applications and policies, no such issues surround the financial information.

In order to succeed in a breach of contract action under Pennsylvania law,[3] a party must demonstrate the following: "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 580 (Pa. Super. Ct. 2003). ACE has clearly shown the existence of a contract, sought to be enforced in this Court by both ACE and WIA. (Compl. Ex. 1; WIA Opp. Br. at 42 n.3.) A reasonable probability of breach has been demonstrated by the disclosure of the confidential information discussed supra. Finally, the resultant damage is the potential loss of continued exclusive rights to provide the insurance to WIA's E-Risk business under the Agency Agreement, and its further erosion by loss of confidential information supposedly safeguarded by WIA. With respect to the breach of the confidentiality portions of the Agency Agreement pertaining to WIA's financial disclosures, therefore, ACE has demonstrated the requisite "reasonable probability" of success on the merits sufficient to support injunctive relief. Gruntal & Co., Inc., 843 F. Supp. at 16.

## 2.   Likelihood of Success: Breach of Fiduciary Duty

After this Court's TRO opinion, the parties cited to Pennsylvania law on the breach of fiduciary duty issue, apparently taking a cue from this Court's application of Pennsylvania law to the Agency Agreement that Pennsylvania law would apply globally to the state law claims at issue in this case. (Op. of Sept. 4, 2008 at 6; Tr. of Sept 19, 2008 at 32:18-21.) In a diversity action, however, this Court applies the choice of law

---

[3]Neither party challenges the choice of law determination, announced in the TRO Opinion, that this Court would apply Pennsylvania law to the Agency Agreement, but Federal law to the injunctive relief issue.

11

rules of the forum state, New Jersey, and those rules require an issue-by-issue analysis of the choice of law. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Warriner v. Stanton, 475 F.3d 497, 499-500 (3d Cir. 2007); Erny v. Estate of Merola, 792 A.2d 1208, 1212-13 (N.J. 2002). Furthermore, under New Jersey's choice of law rules, when the parties do not argue the choice of law issue, this Court applies forum law. Rowe v. Hoffman-La Roche, 917 A.2d 767, 771 (N.J. 2007). While this Court addressed the issue sua sponte on in its TRO Opinion, it did so at that time because the contract before the Court plainly contained a choice-of-law clause and because the ex parte nature of the relief sought (and granted) required close inspection of the rights asserted at that time by ACE. See GEICO v. Fetisoff, 958 F.2d 1137, 1140 n.5 (D.C. Cir. 1992) (raising choice of law issue sua sponte). As the parties here have variously cited to New Jersey and Pennsylvania law without presenting an argument as to why this Court should apply Pennsylvania law instead of New Jersey law to the other issues at hand, this Court will apply New Jersey law to the remaining state law claims. Rowe, 917 A.2d at 771.

New Jersey requires the following elements to establish a breach of fiduciary duty: a fiduciary relationship between the parties, breach of the duty imposed by that relationship, and harm to the plaintiff. McKelvey v. Pierce, 800 A.2d 840, 859-60 (N.J. 2002) (referring to the Restatement (Second) of Torts § 874). New Jersey law states that "[a] fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." F.G. v. MacDonell, 696 A.2d 697, 704 (N.J. 1997). Insurance agents acting under an agency agreement are in a fiduciary agent-principal relationship with the insurance company under New Jersey law. Bohlinger v. Ward & Co., 113 A.2d 38, 41

(N.J. 1955); <u>Department of Ins. v. Universal Brokerage Corp.</u>, 697 A.2d 142, 144 (N.J. Super. Ct. App. Div. 1997).  WIA, therefore, had a fiduciary relationship with ACE, memorialized in the Agency Agreement, to act for the benefit of ACE with respect to the E-Risk business.  <u>F.G.</u>, 696 A.2d at 704; <u>Bohlinger</u>, 113 A.2d at 41.  This establishes a likelihood of success with respect to the first element required for a breach of fiduciary duty claim under New Jersey law.  <u>McKelvey</u>, 800 A.2d at 859-60.

ACE claims that WIA breached the fiduciary duty of loyalty in disclosing confidential information to Scottsdale and supporting Scottsdale in entering into the E-Risk business.  (Pl. Br. at 20-21.)  WIA argues that it was justified in preparing to do business with another entity without violating its duty of loyalty, and that it did not disclose confidential information.  (WIA Opp. Br. 30-32; WIA Reply Br. at 9.)  WIA buttresses its arguments by stating that ACE did not own the information given to Scottsdale under the Agency Agreement, or the trademarks associated with the E-Risk business.  As this Court has already found, <u>supra</u>, that there are sufficient disputed material facts concerning the forms and applications to preclude a finding that they were, in fact, confidential, it will restrict its analysis under ACE's fiduciary duty claim to the financial information disclosed to Scottsdale.

Although WIA is correct that ACE does not own substantial amounts of the confidential information defined in the Agency Agreement, such information is labeled "confidential" in the agreement regardless of the party in ownership.  (Compl. Ex. 1 § IV.I.3.)  Ownership is, therefore, a red herring: the fiduciary relationship comprehends information that the parties trust each other not to disclose to third parties.  See <u>Lamorte Burns & Co., Inc. v. Walters</u>, 770 A.2d 1158, 1169 (N.J. 2001) ("Many jurisdictions have

13

held that an employee's taking of legally protected information from his or her employer, in order to seek a competitive advantage upon resignation, constitutes a breach of the duty of loyalty.").

       With respect to the breach of the duty of loyalty, the parties differ over the application of cases involving employees preparing to leave their current employers. WIA reads the New Jersey case of <u>Lamorte Burns & Co. v. Walters</u> as limited to situations in which the employer was the owner of the confidential information at issue and, alternatively, limited to lists of customers.  770 A.2d 1158; WIA Opp. Br. at 31. Such a reading of <u>Lamorte</u> is too limited.  <u>Lamorte</u> held that "[t]he specific information provided to defendants by their employer, in the course of employment, and for the sole purpose of servicing plaintiff's customers, is legally protectable as confidential and proprietary information." 770 A.2d at 1167.  The data at issue in <u>Lamorte</u> consisted of "client names, addresses, phone and fax numbers, file numbers, claim incident dates, claim contact information, and names of the injured persons."  770 A.2d at 1162. Information such as claim incident dates and the names of injured persons is much more detailed than mere lists of customers, and provides a clearer window into the operation of a business than a list of potential contacts.  The holding of <u>Lamorte</u> on this issue of fiduciary duty is, also, broader than the ownership of a customer list.  In finding that the defendants "purloined protected information from plaintiff's P & I claim files while still employed, for the sole purpose of effecting an advantage in competing with plaintiff immediately upon their resignation and the commencement of their new competitive business," the court specified that the information was not "owned" by the corporation, but that it was "protected."  <u>Id.</u> at 1170.  Under the rule of <u>Lamorte</u>, therefore, a case

involving the breach of fiduciary duty by an employee against his employee in the insurance industry, if WIA exposed confidential information to Scottsdale, it would have breached its duty.

This Court has already found that under the Agency Agreement, the basis of the fiduciary relationship between ACE and WIA, that the financial information disclosed was confidential.  Lamorte also provides that a fiduciary may not release information acquired within the scope of the fiduciary relationship that would harm the interests of the party to whom the duty is owed.  770 A.2d at 1167.  "[U]nless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal."  Id. (quoting the Restatement (Second) of Agency § 395 (1958)). While WIA is permitted under New Jersey law to prepare to change its business relationship while continuing to fulfill its fiduciary duty to ACE, it is not permitted to share information that is confidential and protected under New Jersey fiduciary law with third parties.  Lamorte Burns & Co., Inc., 770 A.2d at 1167; WIA Reply  Br. at 18.  This Court finds that disclosure by WIA of the financial information to Scottsdale in aggregated form would necessarily harm the interests of ACE in maintaining the revenue, shrinking as it may have been, received under the Agency Agreement, and that ACE has satisfied this Court of its likelihood of success as to the remaining prongs of a breach of fiduciary duty claim under New Jersey law for the exposure of the aggregated financial premium information to Scottsdale by WIA.  McKelvey, 800 A.2d at 859-60.

15

### 3.    Irreparable Harm Suffered by ACE on the WIA Claims

"Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will."  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 726 (3d Cir. 2004) (quoting Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998).  A court may not, however, grant injunctive relief for purely economic harm.  Frank's GMC Truck Ctr., Inc. v. General Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988).

ACE makes in clear in the Lupica Reply Declaration that it retained, outside of the Agency Agreement, some business in competition with WIA's E-Risk program. (Lupica Reply Dec. ¶¶ 9, 11.)  ACE also negotiated with WIA in an attempt to alter the Agency Agreement limit the market scope of the coverage provided through the E-Risk program, a move interpreted by WIA as an attempt to shrink the E-Risk business for the benefit of ACE.  (Tomasi Dec. ¶ 42; WIA Reply Br. at 3-4.)  This Court need not reach the disputed issues of ACE's goals in renegotiating coverage under the Agency Agreement or whether ACE threatened termination over those changes.  (WIA Reply Br. at 3-4; ACE Reply Br. at 11.)  Instead, the facts demonstrate that ACE stood to benefit or lose by the expansion or contraction of E-Risk's market share, and that any diminution of the importance of the exclusivity of the Agency Agreement's provisions, as demonstrated by these facts, results in damages potentially suffered by ACE that will be capable of calculation and therefore not susceptible to injunctive relief.  Frank's GMC Truck Ctr., Inc., 847 F.2d at 102.

In Frank's GMC Truck Center, Inc., the Third Circuit found that in a breach of contract action that posed potential losses of sales and service business, the loss was

compensable in purely monetary terms and did not warrant an injunction.  847 F.2d at 102.  Here, it is apparent that ACE is a market participant alongside WIA, in addition to being WIA's sole provider of insurance under the Agency Agreement.  Any loss of ACE profits from diminution of business covered by the Agency Agreement would be computable and purely monetary in nature.  Id.

Disclosure of confidential information or trade secrets may also constitute irreparable harm.  Campbell Soup Co. v. ConAgra, Inc. 977 F.2d 86, 92 (3d Cir. 1992); SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1264 (3d Cir. 1985).  The loss of the secret or confidential information, however, must not have already occurred: once a secret is revealed, there is nothing for an injunction to protect.  Campbell Soup Co., 977 F.2d at 92; Laidlaw, Inc. v. Student Transp. of Am., Inc., 20 F. Supp 2d 727, 768 n.2 (D.N.J. 1998) (comparing belated injunctive relief to "locking the barn door after the horse has been stolen").  This Court cannot enjoin WIA from disclosing any information already disclosed to Scottsdale.  Campbell Soup Co., 977 F.2d at 92 ("We fail to see how immediate irreparable harm could arise at this time in light of the fact that ConAgra has already revealed the non-fried process in a patent application.").  Furthermore, the business decision based upon that information has already been made, and the asset sale—at the time of oral argument—was already set for a date certain.  (ACE Prop. Findings ¶¶ 93-98.)  The only irreparable harm demonstrated by ACE at this time, therefore, is the potential transfer of additional confidential information under the Agency Agreement to Scottsdale.  Campbell Soup Co., 977 F.2d at 92.

4.      **The Harm to the Other Party, the Public Interest, and the Balance of the Equities**

In weighing the harm to WIA and the public interest, this Court found in its September 4, 2008 Opinion that enjoining WIA would result in less harm to WIA than ACE would suffer in the absence of an injunction because the preservation of the status quo for the duration of the TRO would not impact the expected September 30, 2008 closing date of the sale of WIA's assets.  Although the September 30, 2008, date has now passed, this Court finds that the more limited injunctive relief justified at the present time—preventing WIA from further disclosing confidential information—will still result in less harm to WIA if the injunction issues than to ACE if the injunction does not issue. WIA must, under the Agency Agreement and its fiduciary duty, protect confidential information.  Lamorte Burns & Co., Inc., 770 A.2d at 1167; Compl. Ex. 1 § IV.

The public interest generally weighs in favor of enforcing private contracts. Wright Med. Tech., Inc. v. Somers, 37 F.Supp.2d 673, 684 (D.N.J. 1999) (noncompete context).  Confidentiality agreements, encouraging the conduct of business in a forthright and honest manner between participants in the same industry, certainly fall within that public policy.  The public interest would not, however, be served by enforcing a contract beyond its own terms.  The Agency Agreement does not appear to require a transfer of the agreement to an acquiring party; in fact, the terminations clause of the Agency Agreement indicates that an asset sale was contemplated to be a terminating event by the parties.  (Compl. Ex. 1 § XXII.)  WIA's asset sale does not appear to require the transfer of the Agency Agreement to any new entity, and this Court declines to read additional terms into the Agency Agreement requiring such a transfer.  Glassmere Fuel Serv., Inc. v.

18

Clear, 900 A.2d 398, 403 (Pa. Super. Ct. 2006) ("A court should only imply a term into a contract where it is clear that the parties contemplated it or that it is necessary to imply it to carry out the parties intentions.").  While ACE urges that it will be left without a business partner capable of carrying on the Agency Agreement after the asset sale, WIA proposes to continue supporting the Agency Agreement program business after asset sale. (Tr. of Sept. 19, 2008 at 75:4-10.)  While the personnel handling the business may change, no party has brought to this Court's attention any requirement in the Agency Agreement mandating that key personnel conduct the program business, and this Court refuses, once again, to infer any such requirement into a general reasonable efforts clause, as it is not clear that the parties intended any such arrangement as opposed to the flexible terms chosen in the case of an asset sale.  Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 680 (3d Cir. 1991) (interpreting implied duty of reasonable efforts as requiring "some effort to sell" by a distributor, or more than the "bare minimum"); Glassmere Fuel Serv., Inc., 900 A.2d at 403; Compl. Ex. 1 § IV.B.  The public interest, therefore, would weigh in favor of preventing further disclosure of confidential information, but against broader injunctive relief.

In balancing the equities, ACE should receive a preliminary injunction regarding the disclosure of information defined as confidential under the Agency Agreement, as all of the factors weigh it its favor, but that such an injunction should be limited in scope to prospective disclosures of confidential information only.

### 5.  Unclean Hands

WIA argues that ACE is not entitled to injunctive relief before this Court because it has unclean hands.  (WIA Opp. Br. at 36.)  ACE's establishment of the Diversified

Risk business and attempts to solicit E-Risk business, according to WIA, was sufficiently

unjust as to deprive ACE of injunctive relief with regard to the Agency Agreement.  (Id.

at 37-38.)

> The doctrine of unclean hands
>
> > is confessedly derived from the unwillingness of a court,
> > originally and still nominally one of conscience, to give its
> > peculiar relief to a suitor who in the very controversy has
> > so conducted himself as to shock the moral sensibilities of
> > the judge. It has nothing to do with the rights or liabilities
> > of the parties; indeed the defendant who invokes it need not
> > be damaged, and the court may even raise it sua sponte.

Saudi Basic Indus. Corp. v. ExxonMobil Corp., 401 F. Supp 2d 383, 392-93 (D.N.J.

2005) (quoting Gaudiosi v. Mellon, 269 F.2d 873, 882 (3d Cir. 1959)).  The type of

conduct sufficient to invoke the doctrine must be more than negligent: "[a]ny willful act

concerning the cause of action which rightfully can be said to transgress equitable

standards of conduct is sufficient cause for the invocation of the maxim by the

chancellor."  Saudi Basic Indus. Corp., 401 F. Supp 2d at 393 (quoting Monsanto Co. v.

Rohm & Haas Co., 456 F.2d 592, 598 (3d Cir. 1972)).  The conduct alleged to justify a

finding that a litigant's hands are unclean must be related to the instant controversy.  In re

New Valley Corp., 181 F.3d 517, 523 (3d Cir. 1999).

It is notable that ACE, in its original moving papers for the TRO and preliminary

injunction, failed to inform the Court that it had established the Diversified Risk unit in

2007.  The Agency Agreement states that ACE "agrees not to compete, directly or

indirectly, with [WIA] for business currently in-force and/or expiring with [WIA] under

this Agreement during the effective term of this Agreement."  (Compl. Ex. 1 § V.D.1.)

The Diversified Risk unit, as described in the Tomasi Declaration, targets the same

market as the E-Risk program: it offers some products similar to E-Risk, and it targets

the same 500-or-fewer-employee private companies that the Agency Agreement covers.

(Tomasi Dec. ¶¶ 34, 36; Compl. Ex 1 at B-1.)  While ACE's noncompetition clause

under the Agency Agreement is limited to WIA's renewal business, there is evidence that

ACE technically violated the Agency Agreement by soliciting some renewal business.

(Brune Reply Dec. ¶¶ 7-8.)

     ACE asserts first that the Tomasi Declaration is inaccurate or hearsay, and also

that the Diversified Risk program is not "directly related" to the controversy, because the

controversy is about the disclosure of confidential data.  With respect to the Tomasi

Declaration being hearsay, Mr. Tomasi was present at a meeting held by ACE discussing

the Diversified Risk unit.  (Tomasi Dec. ¶ 34.)  With respect to the 500-employee limit,

the Tomasi Declaration bases its information on a publicly accessible website.  (Id. at ¶

12.)  Admissibility, however, while it may go to weight, is not required of facts at the

preliminary injunctions stage of litigation.  Kos Pharms., Inc., 369 F.3d at 718-10.

     ACE's second argument, that the case at hand concerns only the disclosure of the

confidential information, draws a close curtain around the acts alleged in ACE's

Complaint.  In support of its argument, ACE cites a series of cases and attaches several

affidavits.  (Pl. Reply Br. at 11.)  The cases cited by ACE address the issue of relatedness

when applying the doctrine of unclean hands.  In re New Valley Corp., The Third

Circuit found that fictitious consents of assignment did not sufficiently relate to a right to

payment for the doctrine to apply.  181 F.3d at 526.  In Ciba-Geigy Corp. v. Bolar

Pharmaceutical Co., Inc, the court found that allegations of improper marketing, drug

adulteration, and improper labeling were not sufficiently related to claims of trademark

infringement and unfair competition so as to permit the application of unclean hands. 747 F.2d 844, 855 (3d Cir. 1984).  In John Wright, Inc. v. Casper Corp., the court found that claims of unfair competition and false advertising were not sufficiently related to exaggerations and possible inaccuracies in the marketing of the plaintiff's product to apply the doctrine.  419 F. Supp. 292, 324-25 (E.D. Pa. 1976) rev'd on other grounds sub. nom. Donsco, Inc. v. Casper Corp., 587 F.2d 602 (3d Cir. 1978).  This Court finds these cases persuasive on the issue of relatedness.  Here, this Court has found that injunctive relief is appropriate based upon breach of confidentiality.  WIA's argument of unclean hands is based entirely upon conduct that is attenuated from its disclosures of confidential information, namely the conduct of the Diversified Risk unit and various noncompete violations.  See, e.g., Tomasi Dec. ¶¶ 34, 36; Brune Reply Dec. ¶¶ 7-8.  Such issues are not sufficiently related to ACE's motion for preliminary injunctive relief for the doctrine of unclean hands to apply.  John Wright, Inc., 419 F. Supp. at 324-25.

    This Court also finds the logic employed by the Eastern District of Pennsylvania in Quaker Chemical Corp. v. Varga to be quite instructive in the present context.  509 F. Supp 2d 469 (E.D. Pa. 2007) (Robreno, J.).  That case concerned injunctive relief sought by Quaker Chemical to enforce a non-compete agreement against a former employee (Varga) who had gone to work at D.A. Stuart, Inc.  Quaker Chem. Corp., 509 F. Supp 2d at 470-71.  Varga claimed that Quaker could not succeed in obtaining injunctive relief because it had permitted Varga to violate an earlier non-compete agreement when he had moved from D.A. Stuart, Inc., to Quaker at an earlier time.  Id. at 483 n.9.  Judge Robreno held that the unclean hands defense was unavailable because Varga had

mischaracterized the original contractual relationship, and no duty had been violated when Quaker originally hired Varga.  Id.

Although the Diversified Risk unit's offerings do indeed include insurance not covered by the Agency Agreement, such as inland marine coverage, it includes a description of "Professional Risk" coverage that includes nonprofit and private company coverage for entities with less than 500 employees, similar to some of the E-Risk coverage described in the Agency Agreement.  (Compl. Ex. 1.)  The Agency Agreement, however, permits ACE to offer such insurance.  (Id.)  The parties have arranged their relationship in such a manner as to permit direct competition for "new" business. Compare Quaker Chem. Corp., 509 F. Supp 2d at 483 n.9 (identifying relationship between the parties that did not raise specter of unclean hands).  Furthermore, occasional conflicts have occurred with respect to solicitation that have not previously caused the parties to end their relationship; indeed, there is evidence that such conflicts may have been routine.  (Brune Reply Dec. ¶ 7.)  Under these conditions, a finding that ACE may not receive injunctive relief under the doctrine of unclean hands would appear to require a suspension of belief as to much of the evidence on the current record of the actual relationship of the parties, where some friction continually occurred but was insufficient to be deemed fatal until the emergence of the actual asset sale.  This Court, therefore, holds that the instant context does not shock any moral sensibilities, and refuses to apply the doctrine of unclean hands in this matter.

**B.     ACE's Request for Injunctive Relief Against Scottsdale**

ACE brings three claims against Scottsdale in its Complaint, and urges that it is entitled to injunctive relief against Scottsdale on each.  The claims are misappropriation

of trade secrets, tortious interference with contract, and false advertising.  This Court denied injunctive relief on all grounds as to Scottsdale in it previous Opinion on the basis that ACE had not demonstrated a likelihood of success on the merits with respect to any of those claims on the record before the Court at that time.

       1.       **Likelihood of Success: Misappropriation of Trade Secrets**

In an action for misappropriation of a trade secret, a party must demonstrate the following under New Jersey law: "(1) the existence of a trade secret, (2) communicated in confidence by the plaintiff to the employee, (3) disclosed by the employee in breach of that confidence, (4) acquired by the competitor with knowledge of the breach of confidence, and (5) used by the competitor to the detriment of the plaintiff."  Rohm and Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429-30 (3d Cir. 1982).  New Jersey law also provides that confidential information, not rising to the level of a trade secret may also receive protection under trade secret law under certain circumstances.  Lamorte Burns & Co. v. Walters, 770 A.2d 1158, 1166 (N.J. 2001).  Trade secret protection may be inappropriate if such documents have been widely disseminated so as to constitute general knowledge, but absolute secrecy is not required.  Syncsort Inc. v. Innovative Routines Int'l, Inc., No. 04-3623, 2008 WL 1925304, at *6 (D.N.J. Apr. 30, 2008).

A trade secret is defined as "any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Rohm and Haas Co., 689 F.2d at 431.  In assessing trade secrets, courts generally look to

> six factors to determine whether a given idea or
> information is a trade secret: (1) the extent to which the
> information is known outside of the business; (2) the extent

to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879, 893 (N.J. 1988).

In its earlier Opinion, this Court found that ACE had not met its burden with respect to the fourth element, knowledge on the part of Scottsdale of the breach of confidence. (Op. of Sept. 4, 2008 at 8.) Although the parties have since stipulated that Scottsdale's "me-too" filings with state insurance agencies do not constitute misappropriation of trade secrets, ACE claims that the additional transfers of confidential financial information to Scottsdale constitute misappropriation of confidential information or trade secrets. (Pl. Scottsdale Reply Br. at 3; "Me-Too" Stip. ¶ 5.)

With respect to the aggregated financial information received by Scottsdale from WIA, ACE's likelihood of success is significantly stronger. According to ACE, Scottsdale received a 705-page "loss run" on the E-Risk business on January 16, 2008. (Pl. WIA Reply Br. at 6; Pl. Scottsdale Reply Br. at 3.) This information, including "amounts paid by policy and policyholder," constitutes the kind of financial data defined in the Agency Agreement as confidential information. (Pl. WIA Reply Br. at 6; Compl. Ex. 1 § IV.I.2-3.) Such information would also constitute a trade secret: it had limited exposure outside the business, would have been difficult to reconstruct, provided a competitive advantage, and was protected from disclosure not only by the Agency Agreement but by WIA's request of confidentiality in its communication to Scottsdale.

25

Ingersoll-Rand Co., 542 A.2d at 893.  The record in this case demonstrates, however, that industry practice was to ask for this information, and that Scottsdale demanded assurances from WIA that it was not violating the Agency Agreement by providing any information.  (Scottsdale Prop. Findings ¶¶ 19-23, 35.)  Scottsdale, furthermore, was not privy to the terms of the Agency Agreement.  (Id. ¶ 36.)  This Court finds, therefore, that ACE has failed to demonstrate a sufficient likelihood of success as to the fourth element of a misappropriation of trade secrets claim in New Jersey, as Scottsdale acquired the knowledge after a representation by WIA that no confidence was being betrayed. Rohm and Haas Co., 689 F.2d at 428-29; Scottsdale Prop. Findings ¶ 35.

## 2.      Likelihood of Success: Tortious Interference With Contract

Under New Jersey law, a claim for tortious interference with contract requires: "(1) a plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference."  Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1167 (3d Cir. 1993).  This Court previously found that ACE had failed to demonstrate any wrongful act by Scottsdale in its nascent relationship with WIA.  (Op. of Sept. 4, 2008 at 8.)

Under the circumstances of this case, it is apparent that Scottsdale knew of ACE's role in the E-Risk business, and that ACE had an expectation of the economic benefits of the Agency Agreement with WIA.  (Pl. Scottsdale Reply Br. at 5-6.)  The two elements

of tortious interference requiring analysis in this case are, therefore, Scottsdale's "wrongful, intentional interference" with ACE's expected profits, and damages.

ACE's argument with respect any intent of Scottsdale to interfere with the Agency Agreement in its original briefing consisted of the conclusory statement that "Scottsdale necessarily was aware of the ACE USA Companies' expectation and of the Exclusive Agency Agreement, but nevertheless, wrongfully and intentionally interfered with that expectation." (Pl. Br. at 22.) While such a statement admirably complies with Rule 8's specification of the contents of a complaint, it does not underpin ACE's claim sufficiently to demonstrate a likelihood of success for a preliminary injunction. In its reply papers, ACE argues that the "deliberate use" of ACE's filings and its actions to prevent the assignment of the Agency Agreement to WIA's successor entity demonstrate intent to interfere by Scottsdale in the Agency Agreement. (Pl. Scottsdale Reply Br. at 6.) These arguments are also unavailing. All parties appear to agree that insurance agencies are permitted to file each others' forms and rates before state insurance agencies, and therefore Scottsdale's filings are hardly capable of construction as a "wrongful, intentional interference." Lightning Lube, Inc., 4 F.3d at 1167; see, e.g., Scottsdale Opp. Br. at 9 (describing permissive insurance filing scheme in New Jersey); "Me-Too" Stip. ¶ 4. With respect to assignment of the Agency Agreement, ACE concedes that WIA will not be assigning the Agency Agreement to any WIA successor. (Pl. Scottsdale Reply Br. at 6.) Furthermore, WIA asserts that intends to continue to fulfill the Agency Agreement after the asset sale. (Tr. of Sept. 19, 2008 at 75:4-10.) While such an argument may go to the harm issue, without additional facts, this Court may not infer at this time that Scottsdale acted tortiously to bring about any failure to

assign the Agency Agreement.  ACE has, therefore, failed to demonstrate a likelihood of

success with respect to tortious interference with contract.

### 3.     Likelihood of Success: False Advertising

False advertising is a specific cause of action under the Lanham Act, defined as

follows:

> **(1)** Any person who, on or in connection with any goods or
> services, or any container for goods, uses in commerce any
> word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading
> representation of fact, which--
>
>> **(A)** is likely to cause confusion, or to cause
>> mistake, or to deceive as to the affiliation,
>> connection, or association of such person
>> with another person, or as to the origin,
>> sponsorship, or approval of his or her goods,
>> services, or commercial activities by another
>> person, or
>
>> **(B)** in commercial advertising or promotion,
>> misrepresents the nature, characteristics,
>> qualities, or geographic origin of his or her
>> or another person's goods, services, or
>> commercial activities,
>
> shall be liable in a civil action by any person who believes
> that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  This Court found, in its earlier Opinion, that Scottsdale's filings

were not misleading or false if made with the expectation of conducting the E-Risk

business under the E-Risk marks owned by WIA.  (Op. of Sept. 4, 2008 at 9-10.)

ACE argues that it is entitled to injunctive relief against Scottsdale because

Scottsdale has made insurance filings, maintains a website, and utilizes an email address

referring to the E-Risk mark owned by WIA, all of which damage the goodwill possessed

by ACE as the sole provider of E-Risk insurance under the Agency Agreement.  (Id. at 9; Pl. Scottsdale Reply Br. at 8-9.)  ACE further alleges that customers will be deceived by Scottsdale's use of the E-Risk marks, and that it under the Agency Agreement, ACE must continue to be the provider of the E-Risk insurance.  (Pl. Scottsdale Reply Br. at 8-9.) Scottsdale argues that its insurance filings do not constitute false advertising, that it had permission from WIA to use WIA marks, and that the website is WIA's, not Scottsdale's. (Scottsdale Opp. Br. at 10-11; Scottsdale Supp. Mem. at 11.)

This Court already found that if Scottsdale intended to provide the E-Risk insurance, its filings, website, and email address would not constitute false advertising, and ACE concurs.  (Pl. Scottsdale Reply Br. at 8.)  ACE's argument with respect to false advertising, therefore, rests entirely upon the proposition that the Agency Agreement mandates that it continue as the sole provider of insurance under the E-Risk marks.  To the extent such an argument is colorable, it requires this Court to read into the Agency Agreement some right of ACE to exclusivity under WIA's E-Risk marks.  The Agency Agreement contains no such terms; it requires that ACE be the sole provider of insurance, but not that E-Risk utilize the E-Risk marks solely in service of the Agency Agreement.  (Compl. Ex. 1§ XXII.)

ACE is correct that it need not own a mark to sue under § 1125(a).  SK & F, Co. v. Premo Pharma. Labs., Inc., 625 F.2d 1055, 1065 (3d Cir.1980) (citing Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 160 (1st Cir. 1977) for proposition that standing to sue extends beyond trademark owner to other injured parties); Business Trends Analysts v. Fredonia Group, Inc., 650 F. Supp. 1452, 1457-58 (S.D.N.Y. 1987). The fact that ACE has standing to bring its claim, however, does not indicate that it has a

likelihood of success on the merits.  The Agency Agreement does not grant any rights to ACE with respect to the E-Risk marks, other than to be the sole provider of coverage. According to the Agency Agreement, however, WIA may enter into an agreement with respect to the E-Risk business with another company if it sells "all or substantially all of the assets" of WIA, precisely the transaction contemplated in this case.  (Compl. Ex. 1 § XXII.)  Permitting certain activity regarding the E-Risk marks prior to entering into this post-asset sale agreement is certainly contemplated by the Agency Agreement, as otherwise a discontinuation of service or sales would result, which would be contrary to the intent of Section XXII of the Agency Agreement, which permits the creation of an overlapping agreement upon the sale of WIA's assets.  ACE, therefore, cannot succeed on its false advertising claim because the actions by Scottsdale in the marketplace are either not false or misleading, and are indeed permitted by ACE under the most reasonable interpretation of Section XXII of the Agency Agreement.

As this Court finds that ACE has not met its burden in demonstrating a likelihood of success, it is not necessary to reach the remainder of the factors for preliminary injunctive relief, and this Court denies such relief to ACE with respect to Scottsdale.

## C.    WIA's Request for Injunctive Relief Against ACE

Although it had not yet filed a counterclaim in this matter, WIA filed a motion before this Court requesting temporary restraints and a preliminary injunction against ACE for violating the Agency Agreement's non-solicitation provisions.  (WIA Opp. Br. at 41-42.)  As WIA has filed its counterclaim, this Court will address the now-ripened motion as one for a preliminary injunction.  Cf. Alabama v. Unites States Army Corps of Eng'rs, 424 F.3d 1117, 1134 (11th Cir. 2005) ("To secure preliminary injunctive relief, a

petitioner must demonstrate a substantial likelihood of prevailing on at least one of the

causes of action he has asserted."); Adair v. England, 193 F.Supp 2d 196, 200 (D.D.C.

2002) ("When no complaint is filed, the court lacks jurisdiction to entertain the plaintiff's

petition for injunctive relief."); P. K. Family Restaurant v. Comm'r, 535 F. Supp. 1223,

1224 (D. Ohio 1982) ("Absent a complaint, this Court lacks jurisdiction to entertain

plaintiff's petition for injunctive relief."); Schwartz v. United States, No. 06-5581, 2007

WL 2916465, at *3 (D.N.J. Oct. 4, 2007) ("When the movant seeks intermediate relief

beyond the claims in the complaint, the court is powerless to enter a preliminary

injunction.").

> The Agency Agreement states:
>
>> During the term of this Agreement, and for a period of
>> twelve (12) months after the non-renewal of this
>> Agreement or the date of termination of this Agreement . . .
>> [ACE] is prohibited from soliciting or contacting any
>> clients or employees of [WIA] for any purpose
>> contemplated by this Agreement.  In the event of any
>> breach or default by [ACE] of the terms and conditions of
>> this paragraph, [ACE] hereby acknowledges and agrees
>> that [WIA] may be irreparably harmed by any such breach
>> or default, and that [WIA] shall be permitted to pursue any
>> and all available remedies at law and equity including,
>> without limitation, obtaining injunctive relief to cure ant
>> such breach or default by [ACE].

(Compl. Ex. 1 § V.D.1.)  WIA asserts that ACE has contacted some its sub-producers and

offered them higher rates of commission to do business directly with ACE rather than

through WIA.  (WIA Opp. Br. at 41-42.)  The sub-producers WIA claims that ACE

solicited are ARC New England, Socius Insurance, and Colemont.  (WIA Ans. at 14.)

WIA also alleges that ACE solicited WIA employee Steven Dyson in violation of the

Agency Agreement.  (Id.)  ACE argues that WIA has not successfully plead any of the

31

requirements for injunctive relief, and in particular the irreparable harm requirement. (ACE Letter Brief of Sept. 26, 2008 at 2.)

As noted supra, to demonstrate a likelihood of success with respect to a breach of contract claim, WIA must show under Pennsylvania law: "1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage." Pittsburgh Const. Co. v. Griffith, 834 A.2d 572, 580 (Pa. Super. Ct. 2003). If the allegations by WIA are true, they constitute a breach of the Agency Agreement's noncompete provision, which is attested to by both parties as a valid contract.

ACE has submitted a declaration from John Brune that discusses the March 24, 2008 conduct. In the declaration, Brune admits the contact with the WIA sub-producer (Socius Insurance Services, Inc.), agrees that it was in technical contravention of the Agency Agreement, but claims that the contact was in error and that such contacts frequently occur because of a defect in ACE's computer system. (Brune Reply Dec. ¶¶ 7-8.) ACE having admitted a technical breach through the Brune Reply Declaration, it would appear that injunctive relief would follow under the terms of the Agency Agreement. This Court, however, cannot read such a contractual provision as dispositive of the issue of injunctive relief: "[a] contractual provision simply cannot act as a substitute for a finding by this Court that it would be appropriate to invoke its equitable powers." Laidlaw, Inc. v. Student Transp. of America, Inc., 20 F. Supp 2d 727, 766 (D.N.J. 1998) (quoting Dice v. Clincorp, Inc., 887 F.Supp. 803, 810 (W.D. Pa. 1995)). In this circuit, though, it is clear that preliminary injunctions may be granted to enforce non-competition agreements. See e.g., BP Chem. Ltd. v. Formosa Chem. & Fibre Corp.,

229 F.3d 254 (3d Cir. 2000); <u>Arch Pers. Care Prod., L.P. v. Malmstrom</u>, 90 Fed.Appx. 17 (3d Cir.2003). Loss of trade and goodwill can satisfy the requirement for irreparable harm. <u>Pappan Enters., Inc. v. Hardee's Food Sys., Inc.</u>, 143 F.3d 800, 805 (3d Cir. 1998).

Here, WIA has demonstrated that it may be subject to the loss of business and the goodwill built up with its sub-producers if ACE is permitted to solicit them in contravention of the Agency Agreement. It has, therefore, shown that it will suffer the loss of goodwill required for a showing of irreparable harm. <u>Pappan Enters., Inc.</u>, 143 F.3d at 805. Furthermore, the remaining factors operate in WIA's favor with respect to the noncompete: enforcement of contracts and the expectations of the parties is fully in the public interest, and ACE's admission that it intends to comply with the noncompete provision indicates that the harm is greater to WIA than to ACE. A preliminary injunction, therefore, shall issue on behalf of WIA concerning Section V.D.1 of the Agency Agreement.

## CONCLUSION

For the reasons heretofore given, this Court grants ACE's application for a preliminary injunction to the extent that WIA shall be prohibited from further disclosures of confidential information, and denied as to Scottsdale. Furthermore, WIA's motion for injunctive relief against ACE for violation of the Agency Agreement is granted. An appropriate Order accompanies this Opinion.


DATED: October 17, 2008                          _/s/ Jose L. Linares_____
                                                  United States District Judge

33