NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
ACE AMERICAN INSURANCE            )
COMPANY, ILLINOIS UNION           )
INSURANCE COMPANY,                )
WESTCHESTER SURPLUS LINES         )
INSURANCE COMPANY, and            )
WESTCHESTER FIRE INSURANCE        )
COMPANY,                          )
                                  )     Civil Action No.: 08-4369 (JLL)
              Plaintiffs,         )
                                  )     **OPINION**
       v.                         )
                                  )
WACHOVIA INSURANCE AGENCY         )
INC. D/B/A/ E-RISK SERVICES and   )
SCOTTSDALE INSURANCE COMPANY, )
                                  )
              Defendants.         )
_____)

**LINARES, District Judge.**

This matter comes before the Court on the motion for civil contempt [CM/ECF #104] of Defendant Wachovia Insurance Agency, Inc. ("WIA"), filed before this Court on January 13, 2009. Also before the Court is a motion for sanctions [CM/ECF #109] by Plaintiffs ACE American Insurance Company, Illinois Union Insurance Company, Westchester Surplus Lines Insurance Company, and Westchester Fire Insurance Company (collectively "Plaintiffs" or "ACE") filed on January 21, 2009.

**INTRODUCTION**

Although this Court has issued several recent opinions dealing with this matter, some background discussion is required prior to addressing the legal arguments of the

parties' instant motions. ACE filed the instant action by way of Order to Show Cause on September 2, 2008. On September 4, 2008, this Court granted ACE's request for temporary restraints as to WIA, but denied them as to Scottsdale. WIA then moved for injunctive relief regarding the competitive restrictions in the parties' 2006 Agency Agreement (the "Agency Agreement") on September 8, 2008. On October 17, 2008, this Court vacated the previous TRO and granted more limited injunctive relief to ACE solely on the disclosure of additional confidential information. In that same Order, this Court also granted limited injunctive relief to WIA to prevent ACE from violating the non-solicitation covenants in the Agency Agreement.

ACE moved for a stay of the October 17, 2008 Order and re-imposition of the TRO on October 20, 2008. This Court granted ACE's motion that same day. On October 24, 2008, WIA moved for reconsideration of this Court's October 20, 2008 Order staying the preliminary injunctive relief. This court vacated the stay on November 18, 2008.

ACE subsequently appealed. The Third Circuit Court of Appeals granted an expedited appeal of the preliminary injunction, and issued a non-precedential opinion on January 15, 2009, affirming this Court's preliminary injunction.

WIA now moves this Court to enforce the preliminary injunction due to ACE's communication with WIA subproducers[1] in three letters, dated December 24, 2008; December 31, 2008; and January 8, 2009. WIA seeks to have this Court hold ACE in civil contempt, and also seeks an expansion of the preliminary injunction and attorney's

---

[1] The Court will use "subproducers" and "producers" interchangeably throughout, in conformance with the language used by the parties and the Agency Agreement.

fees for the instant motion. (WIA Proposed Form of Order at 2-4.) In response, ACE in turn argues that the letters did not violate the preliminary injunction, and seeks attorney's fees from WIA, arguing that the motion for contempt was baseless. (ACE Opp. Br. at 3.)

## DISCUSSION

**A.** **Civil Contempt**

"A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995) (internal quotation omitted).

As previously set forth, WIA argues that this Court should find ACE in contempt due to three letters sent by ACE to WIA's subproducers; WIA maintains that the letters are direct solicitations of its subproducers in contravention of the October 17, 2008 preliminary injunction.[2] (WIA Br. at 14-15, 19.) ACE, on the other hand, claims that the letters it sent to WIA's subproducers were not solicitations but notice letters, required by regulatory constraints and the business environment created by the WIA asset sale. (ACE Opp. Br. at 12.) ACE further avers that WIA cannot demonstrate the required legal elements for civil contempt, including that the injunction was sufficiently specific to support a finding of contempt. (Id. at 24, 27.)

---

[2]WIA also argues that ACE violated the publicity clause of the Agency Agreement, but this Court did not include the publicity clause in its preliminary injunction. (WIA Br. at 2; Culhane Dec. Ex. A § IV(H)(3).) The motion for contempt, therefore, is limited to the solicitation argument presented by WIA.

### 1. Terms of the Injunction

In the preliminary injunction, this Court enjoined ACE using the following language: "ACE American Insurance Co. is hereby enjoined from violating the non-solicitation terms of the 2006 Agency Agreement." (Order of Oct. 17, 2008 at 2.) In the accompanying opinion, this Court held that WIA had shown that it would suffer irreparably from damages to its goodwill and loss of trade if ACE violated the non-solicitation provisions of the Agency Agreement. (Op. of Oct. 17, 2008 at 33.) The non-solicitation terms referred to specifically in this Court's Opinion consist of Section V(D)(1), which, in relevant part, reads as follows:

> Except as specifically provided with respect to Non-Profit Organization business as set forth in Section D.2 below, [ACE] agrees not to compete, directly, or indirectly, with [WIA] for business currently in-force and/or expiring with [WIA] under this Agreement during the effective term of this Agreement and for a period of twelve (12) months after the date of termination . . . .
>
> During the term of this Agreement, and for a period of twelve (12) months after the non-renewal of this Agreement or the date of termination of this Agreement . . . [ACE] is prohibited from soliciting or contacting any clients or employees of [WIA] for any purpose contemplated by this Agreement.

(Culhane Dec. Ex. A at § V(D)(1) (eliding irrelevant termination clauses).)

### 2. Validity of the Injunction

ACE argues that the injunction is not specific enough, in light of Rule 65(d), for ACE to be held in contempt. In particular, ACE claims that the injunction does not meet Rule 65's requirement that an injunction "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

Fed. R. Civ. P. 65(d)(1)(c).  Courts that have examined references to other documents in an injunction, including the Third Circuit, have found such references to prevent a contempt finding.  Petrello v. White, 533 F.3d 110, 115-16 (2d Cir. 2008) (holding that reference to terms of contract in injunction insufficiently specific); Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir. 1971) (stating that injunctions are "binding only to the extent they contain sufficient description of the prohibited or mandated acts").  "Broad, non-specific language that merely enjoins a party to obey the law or comply with an agreement, however, does not give the restrained party fair notice of what conduct will risk contempt." Louis W. Epstein Family P'ship v. Kmart Corp., 13 F.3d 762, 771 (3d Cir. 1994).

     WIA attempts to rebut this argument by taking the position that ACE consented to the injunction and agreed to abide by its terms, and also that the caselaw cited by ACE is distinguishable.  (WIA Reply Br. at 2, 12-13.)  This Court disagrees; the Third Circuit cases of  Kammerer and Louis W. Epstein Family Partnership cases are close enough to the facts of this case.  Kammerer finds that an injunction that does not specifically refer to a bar on a union applying a summary punishment procedure cannot be the basis for a contempt finding against the union for employing the procedure.  450 F.2d at 280.  "[T]he crucial defect is that the provisions of the order contain no prohibitory language explicitly addressed to the summary punishment area." Id.  Similarly, Louis W. Epstein Family Partnership found that the portion of an injunction reading, "[d]efendant is permanently enjoined from otherwise violating any of the terms of the Declaration of Easements," did not give fair notice of the conduct proscribed.  13 F.3d at 770, 771.  The language used in this Court's October 17, 2008 Order is very close to that used in the

5

insufficiently specific Louis W. Epstein Family Partnership injunction. The injunction against violating the non-solicitation terms of the Agency Agreement in this case required a party to examine another document to ascertain the conduct enjoined, and thus does not provide sufficient notice to support a finding of contempt.

This Court is aware that authority from other circuits permits a relaxation of Rule 65(d) under circumstances when a party has consented to a reference or is demonstrably familiar with the referenced document. Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 646 F.2d 800, 809 (2d Cir. 1981); Eyewonder, Inc. v. Abraham, 293 F. App'x 818, 820 (2d Cir. 2008) (unreported); In re Peck, 155 B.R. 301, 307 (Bankr. D. Conn. 1993) (finding that party participating in drafting of stipulated order could not challenge enforceability). See also Schering Corp. v. Illinois Antibiotics Inc., 62 F.3d 903, 906-07 (7th Cir. 1995) (Posner, J.) (finding Perfect Fit's logic persuasive in expanding injunction covering liquid solution to powdered form of chemical). The circumstances of this case are different. Additionally, this Court views the law of this Circuit to be consistent with the plain directive of Rule 65(d)(1)(c), and declines to follow those cases in this instance. WIA's motion for civil contempt, therefore, is denied. The language of the injunction lacked the required specificity to place ACE on notice of the prohibited conduct.

Mindful as it is that the initial impetus of the ACE/WIA litigation was preliminary injunctive relief, however, this Court shall not permit the preliminary injunction to stand in its current form. Such a situation would mean that this Court's finding that the extraordinary relief of a preliminary injunction was required would be without force and effect. Accordingly, although it will not avail WIA on the instant motion, this Court shall incorporate language in the Order accompanying this Opinion

that will vacate the Order of October 17, 2008, and reissue the same injunctive relief in language sufficiently specific to satisfy Rule 65(d) and Third Circuit precedent.

### 3. Interpretation of the Non-Solicitation Terms

In clarifying the injunction, this Court will also address the issue of whether or not the solicitation terms of Section V(D)(1) of the Agency Agreement prevent ACE from soliciting or contacting WIA's subproducers or the actual policyholders. In their briefs and at oral argument, the parties made greatly differing arguments concerning the meaning of the word "clients" in the non-solicitation terminology of the Agency Agreement. The parties agreed that Section V(D)(1) of the Agency Agreement contains two different restrictions on ACE: the first, not in dispute, restrains ACE from competing indirectly or directly with WIA for renewal business. The parties disagree, however, as to the proper interpretation of a second clause, constituting a separate limitation on ACE's activities: "[ACE] is prohibited from soliciting or contacting any clients or employees of [WIA] for any purpose contemplated by this Agreement." (Culhane Dec. Ex. A at § V(D)(1).) The parties' disagreement is purely over the interpretation of the word "client."

WIA urges this Court to find "client" to refer to its producers and subproducers, and read the second non-solicitation clause as preventing ACE from contacting or soliciting new E-Risk-like business from WIA's current producers or subproducers. (WIA Reply Br. at 4-5.) ACE argues that the intention of the parties was that "client" meant the actual policyholders, and that the second non-solicitation clause prevented ACE from directly seeking new business from the policyholders themselves, while still

7

allowing ACE to seek new business from WIA's current producers and subproducers. (ACE Opp. Br. at 26.)

After briefing and argument, this Court has before it an extensive record with respect to the meaning of the word "client" in Section V(D)(1) of the Agency Agreement. Additionally, this Court has before it all of the prior representations of the parties in writing and at argument on the preliminary injunction, when this Court last interpreted the non-solicitation terms of the Agency Agreement. Given the vast extent of this record, this Court finds that it need not, as ACE requests, hold an additional hearing with live witness testimony concerning the sole issue of the proper interpretation of the word "client" in the Agency Agreement.

This Court will turn first to the plain meaning of the word "client." The dictionary definition this Court finds most relevant is "[a] customer or patron." Second American Heritage Dictionary 281 (2nd Coll. Ed. 1991). Although a common primary dictionary meaning often relates to professional advice, similar to the definition in Black's ("[a] person or entity that employs a professional for advice or help in that professional's line of work"), this is not an instance involving professional advice. Black's Law Dictionary 271 (8th ed. 1999). What the subproducers or policyholders sought were contracts for insurance coverage, a standard service in the insurance industry, and this does not squarely fit into the definition of professional advice or assistance. See, e.g Second American Heritage Dictionary 281 (2nd Coll. Ed. 1991) (stating primary definition of "client" as "[o]ne for whom professional services are rendered, as by a lawyer."). The determination that the word "client" in the Agency Agreement refers to "customers," however, is not dispositive without further reference to

8

the record, as both policyholders and subproducers could be considered to be customers of WIA in the abstract.

ACE argues that the terminology employed throughout the Agency Agreement supports its interpretation of the word "client," as the document uses the word "producers" elsewhere but does not include the word "client" in any other place. A review of the Agency Agreement indicates that the Agreement itself uses the term "producer" or "subproducer" throughout to describe parties with which WIA has a business relationship in the nature of sales referrers or subcontractors. (See, e.g., Culhane Dec. Ex. A §§ IV(A)(1), IV(D), IV(E), IV(J)(1), VII.) The Agency Agreement also frequently uses the terms "insured" and "policyholder" to refer to the actual beneficiaries of the policies. (Tr. of Feb. 5, 2009 at 9.)

Significantly, however, this Court finds that the Agency Agreement has an additional non-solicitation term that defines both parties' relationship to policyholders. (Culhane Dec. Ex. A § IX(A).) "Except as otherwise provided in this Section, policyholder lists, including expirations, and their use and control for solicitation of business written or bound by or through [WIA] shall be the sole and exclusive property of [WIA]." (Id.) This is a non-solicitation clause, separate from those discussed supra, which limits ACE's ability to solicit business directly from policyholders. The Agency Agreement, therefore, contains a non-solicitation clause that prevents ACE from soliciting business from existing WIA policyholders, and a separate non-solicitation clause covering "clients." If this Court found ACE's interpretation of the Agency Agreement controlling, the Agency Agreement would contain two separate clauses, in two separate sections, controlling the same behavior on the part of ACE—effectively

9

reading one of them out of the contract. Furthermore, not only would there be an overlap between the two clauses, the breadth of the first non-solicitation clause, covering "soliciting or contacting" clients "for any purpose contemplated by this Agreement" would entirely subsume the policyholder clause, which covers only solicitation and is limited to "business written or bound by" WIA—in other words, renewal business. (Id. §§ V(D)(1); IX(A).)

ACE also supports its interpretation with declarations by David Lupica and Patricia Gibson. (Lupica Dec. ¶ 71; Gibson Dec. ¶ 44.) Those declarations state that senior ACE employees interpreted the non-solicitation clause in Section V(D)(1) of the Agency Agreement as using "clients" to refer to policyholders. (Lupica Dec. ¶¶ 71, 73; Gibson Dec. ¶ 44.) Extrinsic evidence interpreting a contractual term, however, is useful only when the meaning of the term is ambiguous within the contract under Pennsylvania law.[3] Great Am. Ins. Co. v. Norwin School Dist., 544 F.3d 229, 243 (3d Cir. 2008) (quoting Murphy v. Duquesne Univ., 777 A.2d 418, 429 (Pa. 2001)). In this instance, where the parties have framed the meaning of the word "client" as either "customers" or "policyholders," the use of the word "policyholder" in a separate non-solicitation clause in the Agency Agreement renders the word "client" non-ambiguous: "client" does not potentially have the meaning "policyholder" within the Agency Agreement as presented to the Court, and therefore the extrinsic evidence offered by ACE on this issue is not relevant to this Court's inquiry. Additionally, this Court notes that the extrinsic evidence offered in the ACE declarations is difficult to harmonize with the admissions of both

---

[3] This Court previously found that Pennsylvania law applied to the Agency Agreement. (Op. of Oct. 17, 2008 at 11.)

parties that they do not ordinarily deal with policyholders in order to generate business: both ACE and WIA stated that they rely on producers for their sales, not individual insureds.  (Tr. of Feb. 5, 2008 at 46, 75.)  This Court rejects the interpretation of the word "client" as equivalent to "policyholder."

This Court finds that reading "client" in Section V(D)(1) of the Agency Agreement to mean "customer" and include producers and subproducers is not similarly objectionable.  Recognizing that "client" in Section V(D)(1) means "customer" creates no new ambiguities within the Agency Agreement, despite its use of "producer" and "sub-producer" elsewhere.  The terms "producer" and "sub-producer" occur in several places as part of a list of WIA business partners which also include "brokers."  (See, e.g., Culhane Dec. Ex. A §§ IV(A)(1), IV(D)(2) VII.)  This Court finds that the most reasonable interpretation of the word "client" in Section V(D)(1) of the Agency Agreement is as a catch-all term for producers, sub-producers, brokers, etc., all of whom generate business for WIA.

**B.      Expansion of the Preliminary Injunction**

WIA seeks an expansion of the preliminary injunction to cover the Agency Agreement's clause pertaining to the use of WIA's name by ACE (the "publicity clause").  (WIA Br. at 19-20.)  The clause in question reads as follows: "[ACE] shall not use the name of [WIA], its affiliates or its accounts in any advertising and/or promotional or public materials without the prior review and written consent of [WIA]."  (Culhane Dec. Ex. A § V(H)(3).)

A preliminary injunction is an "'extraordinary remedy' and 'should be granted only in limited circumstances.'"  Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d

Cir. 2004) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)).  Nonetheless, a district court's decision to issue a preliminary injunction is discretionary.  Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1334 (Fed. Cir. 2006).  A court may grant a preliminary injunction only if a party shows: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  Kos Pharms., 369 F.3d at 708.  A party must produce sufficient evidence of all four factors – and a district court should weigh all four – for the requested injunctive relief to be awarded.  Winback, 42 F.3d at 1427.  However, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  Id. at 1427, n.8.  Failure to demonstrate any one of these factors is fatal to the requested relief.  Nutrasweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999).

    **1.  The Letters**

The three letters sent by ACE to WIA's producers and subproducers all utilize different language in expressing ACE's concerns over the changing ACE/WIA relationship.  The December 24, 2008 letter opened with a short introduction referencing ACE's long experience with the specific insurance market in which WIA operated.  It then went on:

> No matter what you may have been told or read, ACE wants to assure that it is dedicated to the small private and not-for-profit market segment, and would like to encourage you to continue to do E-Risk qualified business with us. We believe that we can provide you with the most

> competitive terms and best service, backed up by one of the most preeminent insurance companies in the United States. We value and want to retain your business, and believe that our experience combined with our record of performance and the high level of service that we are able to offer are compelling reasons for you to continue to do business with us.
>
> You may also have read or heard that WIA os selling assets to a new company that would act on behalf of Scottsdale. Regardless, ACE remains dedicated to providing the highest quality product and service with respect to the E-Risk qualified business.  WIA has assured us that it will continue as ACE's exclusive insurance agent under an agency agreement that remains in effect until January 1, 2012 unless terminated pursuant to its terms.  The same dedicated underwriting and claims personnel at ACE will continue to be available going forward to provide the best services possible.  We are firmly committed to addressing and resolving any questions or problems that you may now be encountering.
>
> Finally, you should know that ACE is honoring all renewal quotes and will compete for any new or renewal business that Scottsdale may solicit . . . .

(Culhane Dec. Ex. C.)

The December 31, 2008 letter also began with a short introduction, followed by a summary of ACE's understanding of the ordinary course of business:

> At the outset, for any new submissions of private and not-for-profit business, which was not previously written through E-Risk Services, please continue to submit new business submissions in the normal course—directly to ACE.  ACE will continue to handle new submissions immediately and expeditiously, providing the same superior knowledge and expertise that it has provided over the past eight years.  As you know, ACE is one of the leading and preeminent insurers in the United States, which has and will continue to be one of the leading insurers in providing coverage for private and not-for-profit business.

(Culhane Dec. Ex. D.)  The letter then discussed the continuity of the ACE-WIA relationship in light of the WIA asset sale, and the departure of E-Risk Services management to work in a new company with Scottsdale as the insurance carrier.  (Id.)  It spoke to any concerns the subproducers might have:

> In light of these significant changes at E-Risk Services, let me point out the following, especially because we are aware that so many of you wish to continue doing E-Risk business directly with ACE.  As things currently stand the Exclusive Agency Agreement between ACE Westchester and E-Risk Services is still in effect and has not been terminated.  You should be aware that the agreement pertains only to E-Risk renewals, and even then it only applies to certain classes or categories of E-Risk business as defined in the Agreement.  Therefore, you should continue to do renewal ACE business through E-Risk (or WIA in the event the name "E-Risk" is sold to Management), which is obligated to use ACE as the issuing carrier.  However, as was the case before, you have the option to submit new business not previously written through E-Risk Services directly to ACE.

(Id.)  The letter then reiterated that renewal E-Risk business must be done through WIA, but indicated that ACE was not sure who the proper individuals were to contact at WIA.

(Id.)  ACE then proposed a workaround for the subproducers:

> In the meantime, until we have been provided with the requested contact information and in an abundance of caution, we ask that you send ACE your renewal submissions directly so that there is no delay in the handling of such submissions, and we will make sure such submissions are ultimately submitted to E-Risk Services.  We will then make sure that it gets to the appropriate people at E-Risk or WIA as the case may be.  As you likely know, ACE may have regulatory responsibilities to provide renewal notices to policyholders.  We will continue to work to ensure that all of ACE's regulatory obligations to policyholders are strictly met.

(Id.)

The final letter before this Court, that of January 8, 2009, expanded upon the December 31 letter. In relevant part, it stated:

> As I stated in my earlier letter, for any new private, not-for-profit and professional liability submissions not previously written through E-Risk Services, you may submit such new submissions directly to ACE. ACE will handle any such new submissions immediately and expeditiously, providing the same high level of service that we always have.
>
> With respect to January 1, 2009 through March 31, 2009 renewals of any ACE policies for private, not-for-profit and professional liability business that were written through E-Risk Services, as we manage the BMLI transition and until further notice, you should submit such renewals directly to ACE. With the exception of California domiciled risks, all renewal business will be renewed as per the expiring terms, conditions and premium. All you need to do is send us a copy of the expiring policy, last year's application and binder, and we will issue renewal certificates that will provide a new aggregate limit of liability for one additional year. For California business, we will require the expiring policy and binder with a current application. Renewals will be rated according to the updated information but will be renewed via certificate, leaving the policy language unchanged . . . .

(Culhane Dec. Ex. B.) The letter continued on to provide ACE contact information and stated that ACE would honor certain outstanding quotes. (Id.)

### 2. Likelihood of Success on the Merits

WIA's argument with respect to likelihood of success is that the letters were "promotional materials" within the meaning of the Agency Agreement, and that it had not given written consent to ACE prior to the letters' distribution. (WIA Br. at 20.) The term "promotional materials" in the publicity clause of the Agency Agreement occurs in

conjunction with the terms "advertising" and "public materials." An advertisement implies a widespread appeal for business, as does something made public. See, e.g., Second American Heritage Dictionary 82 (2nd Coll. Ed. 1991) (first definition of "advertise" involves "public announcement"). As a word is known by its associates under the doctrine of noscitur a sociis, "promotional" in the publicity clause is best understood as relating to a public activity. Northway Vill. No. 3, Inc. v. Northway Props., Inc., 244 A.2d 47, 50 (Pa. 1968); Samuel Williston & Richard A. Lord, 11 Williston on Contracts § 32:6 (4th Ed. 1999) ("The ancient maxim noscitur a sociis summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words."); Second American Heritage Dictionary 991 (2nd Coll. Ed. 1991) (definitions of "promotional" include "advertising or other publicity"). Promotional materials, therefore, in the sense of the publicity clause of the Agency Agreement, should be regarded as efforts to reach large audiences, including the public. Here, while the letters were sent to all of WIA's subproducers, there was no wider "promotional" effort as implied by the remaining words in Section V(H)(3).

Additionally, the promotional portions of the letters were not the primary communication being made, and the references to submitting new business directly to ACE did not constitute the majority of the letters' contents. (Culhane Dec. Ex. B, D). While the letters do speak of ACE in glowing terms, their purpose was mainly to assure subproducers that ACE intends to uphold the Agency Agreement, and the bulk of their content relates to renewal business. (Id.) It is not clear enough from the language of the Agency Agreement's publicity clause and the letters themselves that a violation occurred sufficient to support injunctive relief. See Gruntal & Co., Inc. v. Steinberg, 843 F. Supp.

16

1, 16 (D.N.J. 1994) (requiring a reasonable probability of success on the merits).  As WIA has not, therefore, shown the requisite likelihood of success, it is not entitled to the proposed expansion of the preliminary injunction.  Nutrasweet Co., 176 F.3d at 153.

**C.     ACE's Motion for Sanctions**

ACE moves for sanctions against WIA on two grounds: first, it argues that the motion for civil contempt was frivolous, and second, it argues that WIA submitted false declarations to the Court.  (ACE Opp. Br. at 29-30.)  ACE does not specify whether it seeks the sanctions under rule, statute, or this Court's inherent power.

WIA's motion for civil contempt was not frivolous.  A frivolous motion is one without a basis in law or fact.  See Quiroga v. Hasbro, Inc., 934 F.2d 497, 503 (3d Cir. 1991) (finding claim without factual or legal basis frivolous in Title VII attorney's fee appeal).  While WIA did not succeed in its contempt motion, failure does not imply frivolity.  This case is distinguishable from those ACE relies on its brief, because there were indeed colorable facts that indicate a possible violation of the injunction by ACE, and bad faith is not present here.  San Francisco Web Pressmen and Prepress Union Local No. 4 v. Santa Cruz County Sentinel, 8 F. App'x 755 (9th Cir. 2001) (unreported) (affirming santions applied after finding of bad faith); Sutton v. American Fed'n of State, County and Mun. Workers, No. 96-6065, 1997 WL 34663, at *7 (E.D. Pa. Jan. 28, 1997) (applying sanctions for contempt order sought against nonparties).

ACE also claims that WIA submitted false declarations to this Court.  WIA and Scottsdale previously maintained to this Court that WIA's renewal rights under the Agency Agreement would not be sold to the new E-Risk entity, Newco.  (Keopff Dec. ¶¶ 56-57.)  This is contradicted by an email sent out by Newco on January 6, 2009, which

17

states that Newco may now "solicit and write the E-Risk renewal business." (Id. ¶ 58.) In response, WIA states that Newco misrepresented its rights, and that it did not sell any right to E-Risk renewal business to Newco. (WIA Reply Br. at 14.) WIA's explanation of the misrepresentation (by a nonparty to this suit) is supported by the declaration of Daniel Glassberg. (Reply Glassberg Dec. ¶ 4.) This Court finds that WIA's explanation for the disparity between the Newco email and WIA's representations to this Court is reasonable, and that sanctions on this motion are not warranted.

## CONCLUSION

For the reasons heretofore given, WIA's motion for contempt, expansion of the preliminary injunction, and attorney's fees is denied, and ACE's motion for sanctions is also denied. An appropriate Order accompanies this Opinion.

DATED: February 13, 2009                         /s/ Jose L. Linares
                                                 United States District Judge